UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-20300 CR-MOORE / McALILEY

18 U.S.C. § 1349
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(1)(A)
18 U.S.C. § 2
18 U.S.C. § 982

FILED by ___ D.C.
MAY 06 2014
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA

vs.

ABIGAIL AGUILA,
ESTRELLA PEREZ,
SOLCHYS PEREZ,
and
MONICA MACIAS,

           Defendants.
_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.    The Medicare Program ("Medicare") was a federal health care program providing benefits to persons who were 65 or older or disabled. Medicare was administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320-7b(f).

3. "Part A" of the Medicare program covered certain eligible home health care costs for medical services provided by a home health agency ("HHA"), to beneficiaries who required home health services because of an illness or disability that caused them to be homebound. Payments for home health care medical services under Medicare Part A were typically made directly to an HHA or provider based on claims submitted to the Medicare program for qualifying services that had been provided to eligible beneficiaries, rather than to the beneficiary.

4. Physicians, clinics and other health care providers, including HHAs, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare information number, the services that were performed for the beneficiary, the date that the services were provided, the cost of the services, and the name and provider number of the physician or other health care provider who ordered the services.

5. CMS did not directly pay Medicare Part A claims submitted by Medicare-certified HHAs. CMS contracted with different companies to administer the Medicare Part A program throughout different parts of the United States. In the State of Florida, CMS contracted with Palmetto Government Benefits Administrators ("Palmetto") to administer Part A HHA claims. As administrator, Palmetto was to receive, adjudicate, and pay claims submitted by HHA providers under the Part A program for home health claims.

## Part A Coverage and Regulations

### Reimbursements

6. The Medicare Part A program reimbursed 100% of the allowable charges for participating HHAs providing home health care services only if the patient qualified for home health benefits. A patient qualified for home health benefits only if:

   a. the patient was confined to the home, also referred to as homebound;

   b. the patient was under the care of a physician who specifically determined there was a need for home health care and established the Plan of Care ("POC"); and

   c. the determining physician signed a certification statement specifying that the beneficiary needed intermittent skilled nursing services, physical therapy, or speech therapy and that the beneficiary was confined to the home; that a POC for furnishing services was established and periodically reviewed; and that the services were furnished while the beneficiary was under the care of the physician who established the POC.

7. HHAs were reimbursed under the Home Health Prospective Payment System ("PPS"). Under PPS, Medicare paid Medicare-certified HHAs a predetermined base payment for each 60 days that care was needed. This 60-day period was called an "episode of care." The base payment was adjusted based on the health condition and care needs of the beneficiary. This adjustment was done through the Outcome and Assessment Information Set ("OASIS"), which was a patient assessment tool for measuring and detailing the patient's condition. If a beneficiary was still eligible for care after the end of the first episode of care, a second episode could commence. There were no limits to the number of episodes of home health benefits a beneficiary could receive as long as the beneficiary continued to qualify for home health benefits.

8. In order to be reimbursed, the HHA would submit a Request for Anticipated Payment ("RAP") and subsequently receive a portion of its payment in advance of services being rendered. At the end of a 60-day episode, when the final claim was submitted, the remaining portion of the payment would be made. As explained in more detail below, "Outlier Payments" were additional PPS payments based on visits in excess of the norm. Palmetto paid Outlier Payments to HHA providers under PPS where the providers' RAP submissions established that the cost of care exceeded the established Health Insurance Prospective Payment System ("HIPPS") code threshold dollar amount.

### Record Keeping Requirements

9. Medicare Part A regulations required HHAs providing services to Medicare patients to maintain complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the HHAs. These medical records were required to be sufficient to permit Medicare, through Palmetto and other contractors, to review the appropriateness of Medicare payments made to the HHA under the Part A program.

10. Among the written records required to document the appropriateness of home health care claims submitted under Part A of Medicare was a POC that included the physician order for home health care, diagnoses, types of services/frequency of visits, prognosis/ rehabilitation potential, functional limitations/activities permitted, medications/treatments/ nutritional requirements, safety measures/discharge plans, goals, and the physician's signature. Also required was a signed certification statement by an attending physician certifying that the

patient was confined to his or her home and was in need of the planned home health services, and an OASIS form.

11.     Medicare Part A regulations required provider HHAs to maintain medical records of every visit made by a nurse, therapist, and home health aide to a beneficiary. The record of a nurse's visit was required to describe, among other things, any significant observed signs or symptoms, any treatment and drugs administered, any reactions by the patient, any instruction provided to the patient and the understanding of the patient, and any changes in the patient's physical or emotional condition. The home health nurse, therapist and aide were required to document the hands-on personal care provided to the beneficiary as the services were deemed necessary to maintain the beneficiary's health or to facilitate treatment of the beneficiary's primary illness or injury. These written medical records were generally created and maintained in the form of "clinical notes" and "home health aide notes/observations."

## Special Outlier Provision

12.     Medicare regulations allowed certified HHAs to subcontract home health care services to nursing companies, registries, or groups (nursing groups), which would, in turn, bill the certified home health agency. The certified HHA would then bill Medicare for all services provided to the patient by the subcontractor. The HHA's professional supervision over arranged-for services required the same quality controls and supervision of its own employees. However, Medicare regulations prohibit one HHA merely serving as a billing mechanism for another agency.

13.     For insulin-dependent diabetic beneficiaries, Medicare paid for insulin injections by an HHA when a beneficiary was determined to be unable to inject his or her own insulin and the beneficiary had no available care-giver able and willing to inject the beneficiary.

Additionally, for beneficiaries for whom occupational or physical therapy was medically necessary, Medicare paid for such therapy provided by an HHA. The basic requirements that a physician certify that a beneficiary is confined to the home or homebound and in need of home health services, as certified by a physician, was a continuing requirement for Medicare to pay for such home health benefits.

14. While payment for each episode of care was adjusted to reflect the beneficiary's health condition and needs, Medicare regulations contained an "outlier" provision to ensure appropriate payment for those beneficiaries who had the most extensive care needs, which may result in an Outlier Payment to the HHA. These Outlier Payments were additions or adjustments to the payment amount based on an increased type or amount of medically necessary care. Adjusting payments through Outlier Payments to reflect the HHA's cost in caring for each beneficiary, including the sickest beneficiaries, ensured that all beneficiaries had access to home health services for which they were eligible.

## The Defendants and Related Companies

15. Trust Care Health Services, Inc. ("Trust Care") was a Florida corporation incorporated on or about October 10, 2005, that did business in Miami-Dade County, Florida, as an HHA that purportedly provided home health care services to eligible Medicare beneficiaries. From at least in or around March 2007, and continuing at least into 2010, Trust Care was an authorized Medicare provider, approved to submit claims to Medicare for HHA-related benefits and services. Trust Care was owned and operated by Roberto Marrero and Sandra Fernandez Viera.

16. Defendants **ABIGAIL AGUILA**, **ESTRELLA PEREZ**, and **MONICA MACIAS** were residents of Miami-Dade County, Florida.

17. Defendant **SOLCHYS PEREZ,** a resident of Miami-Dade County, Florida, was the owner and operator of Dukris Design Enterprises Corp. ("Dukris Corp."), a corporation organized under the laws of the State of Florida, which purportedly did business at 3237 SW 25th Street, Miami, Florida, 33133.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud**
**(18 U.S.C. § 1349)**

1. Paragraphs 1 through 17 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or around March 2007, and continuing through in or around at least January 2010, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ESTRELLA PEREZ**
**and**
**SOLCHYS PEREZ,**

did knowingly and willfully combine, conspire, confederate and agree with each other and others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## PURPOSE OF THE CONSPIRACY

3. It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things: (a) offering and paying kickbacks and bribes to Medicare beneficiaries in exchange for the use of their Medicare beneficiary numbers to file claims for home health care; (b) submitting and causing the submission of false and fraudulent claims to Medicare; (c) concealing of the submission of false and fraudulent claims to Medicare, the receipt and transfer of the proceeds from the fraud, and the payment and receiving of kickbacks; and (d) causing the diversion of the proceeds of the fraud for the personal use and benefit of the defendants and their co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

4. **ESTRELLA PEREZ, SOLCHYS PEREZ**, and their co-conspirators solicited and accepted kickbacks in return for referring Medicare beneficiaries to Trust Care for home health services that were not medically necessary and not provided.

5. **ESTRELLA PEREZ, SOLCHYS PEREZ**, and their co-conspirators offered and paid kickbacks to Medicare beneficiaries in return for the beneficiaries agreeing to serve as patients so that Trust Care could bill Medicare for services that were not medically necessary and not provided.

6. **ESTRELLA PEREZ, SOLCHYS PEREZ**, and their co-conspirators caused patient documentation to be falsified to make it appear that Medicare beneficiaries qualified for and received the home health services that were billed to Medicare.

7. **ESTRELLA PEREZ, SOLCHYS PEREZ**, and their co-conspirators filed and caused to be filed false and fraudulent claims with Medicare for more than $20 million, seeking payment for the costs of home health services that were not medically necessary and not provided.

8. As a result of these false and fraudulent claims, **ESTRELLA PEREZ, SOLCHYS PEREZ,** and their co-conspirators caused Medicare to pay Trust Care more than $15 million.

9. **ESTRELLA PEREZ, SOLCHYS PEREZ**, and their co-conspirators transferred the fraud proceeds to themselves and companies they controlled and used the proceeds to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Defraud the United States and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1. Paragraphs 1 through 17 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. From in or around March 2007, and continuing through in or around at least January 2010, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants,

**ABIGAIL AGUILA,
ESTRELLA PEREZ,
SOLCHYS PEREZ,
and
MONICA MACIAS,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other and others known and unknown to the

Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program; and to commit certain offenses against the United States, that is: to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check, in return for referring an individual to a person for the furnishing and arranging for the furnishing of an item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare.

## PURPOSE OF THE CONSPIRACY

3. It was the purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by: (1) soliciting and receiving kickbacks and bribes for referring Medicare beneficiaries to Trust Care so that their Medicare beneficiary numbers would be used to file claims for home health care; and (2) submitting and causing the submission of claims to Medicare for home health services that the co-conspirators purported to provide to those beneficiaries.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4. **ABIGAIL AGUILA, ESTRELLA PEREZ, SOLCHYS PEREZ,** and **MONICA MACIAS** accepted kickbacks from co-conspirators at Trust Care in exchange for referring Medicare beneficiaries to be placed at Trust Care, while knowing that Trust Care would in turn bill Medicare for home health services purportedly rendered to the recruited beneficiaries.

5. **ABIGAIL AGUILA, ESTRELLA PEREZ, SOLCHYS PEREZ,** and **MONICA MACIAS** caused Trust Care to submit claims to Medicare for home health services purportedly rendered to the recruited Medicare beneficiaries.

6. **ABIGAIL AGUILA, ESTRELLA PEREZ, SOLCHYS PEREZ,** and **MONICA MACIAS** caused Medicare to pay Trust Care based upon the claims for home health services purportedly rendered to the recruited Medicare beneficiaries.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1. On or about August 28, 2009, **ABIGAIL AGUILA** cashed check number 5214, drawn on the corporate account of Trust Care in the approximate amount of $2,500.

2. On or about August 28, 2009, **ABIGAIL AGUILA** cashed check number 5219, drawn on the corporate account of Trust Care in the approximate amount of $2,000.

3. On or about September 14, 2009, **ESTRELLA PEREZ** deposited check number 5343, drawn on the corporate account of Trust Care in the approximate amount of $11,155, into her bank account at Eastern Financial Florida Credit Union.

4. On or about November 30, 2009, **SOLCHYS PEREZ** deposited check number 4787, drawn on the corporate account of Trust Care in the approximate amount of $6,020, into an account held in the name of Dukris Corp, a company she controlled.

5. On or about November 30, 2009, **MONICA MACIAS** cashed check number 4777, drawn on the corporate account of Trust Care in the approximate amount of $1,008.

6. On or about December 14, 2009, **MONICA MACIAS** cashed check number 4941, drawn on the corporate account of Trust Care in the approximate amount of $1,512.

7. On or about January 5, 2010, **SOLCHYS PEREZ** deposited check number 5235, drawn on the corporate account of Trust Care in the approximate amount of $1,250, into an account held in the name of Dukris Corp, a company she controlled.

8. On or about January 14, 2010, **ESTRELLA PEREZ** deposited check number 5342, drawn on the corporate account of Trust Care in the approximate amount of $15,000, into her account at Eastern Financial Florida Credit Union.

All in violation of Title 18, United States Code, Section 371.

### COUNTS 3-6
### Receipt of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(1)(A))

1. Paragraphs 1 through 17 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2. On or about the dates enumerated below, at Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, as specified below, did knowingly and willfully solicit and receive remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in the form of cash and in kind, including by check, as set forth below, in return for referring an individual to a person for the furnishing and arranging for the furnishing of items and services for which payment may be made in whole and in part under a Federal health care program, that is, Medicare, as set forth below:

| Count | Defendant | Approximate Date | Approximate Amount of Kickback |
|---|---|---|---|
| 3 | ESTRELLA PEREZ | September 14, 2009 | $11,155 |
| 4 | ESTRELLA PEREZ | January 14, 2010 | $15,000 |
| 5 | SOLCHYS PEREZ | November 30, 2009 | $6,020 |
| 6 | SOLCHYS PEREZ | January 5, 2010 | $1,250 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A) and Title 18, United States Code, Section 2.

## CRIMINAL FORFEITURE
## (18 U.S.C. § 982)

1. The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which each of the defendants, **ABIGAIL AGUILA, ESTRELLA PEREZ, SOLCHYS PEREZ,** and **MONICA MACIAS,** has an interest.

2. Upon conviction of a Federal health care offense, as alleged in Count 1 of this Indictment, each of the defendants shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation, pursuant to Title 18, United States Code, Section 982(a)(7).

3. The property subject to forfeiture includes but is not limited to the sum that constitutes the gross proceeds the defendants derived from the Federal health care offense alleged in Count 1 of this Indictment.

4. If any of the property described above, as a result of any act or omission of any of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States of America to seek forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p). Specifically, said substitute property may include the following:

1) real property located at 10850 SW 32 Street, Miami, Florida;

2) 2012 Nissan Rogue, VIN: JN8AS5MV7CW390148; and

3) 2012 Nissan Altima, VIN: 1N4AL2AP9CC190487.

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code, Section 982(b).

A TRUE BILL

_____
FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
GEJAA GOBENA
DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
A. BRENDAN STEWART
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | |
| ABIGAIL AGUILA, et al., | **CERTIFICATE OF TRIAL ATTORNEY*** |
| Defendants. _____ / | Superseding Case Information: |

**Court Division**: (Select One)

| | | | | New Defendant(s) | ___ | No ___ |
|---|---|---|---|---|---|---|
| _X_ | Miami | ___ | Key West | Number of New Defendants | ___ | |
| ___ | FTL | ___ | WPB ___ FTP | Total number of counts | ___ | |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No)   __YES__
   List language and/or dialect   Spanish

4. This case will take _7_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)

   | I   | 0 to 5 days     | ___ | Petty   | ___ |
   |-----|-----------------|-----|---------|-----|
   | II  | 6 to 10 days    | _X_ | Minor   | ___ |
   | II  | 11 to 20 days   | ___ | Misdem. | ___ |
   | IV  | 21 to 60 days   | ___ | Felony  | _X_ |
   | V:  | 61 days and over| ___ |         |     |

6. Has this case been previously filed in this District Court? (Yes or No)   No
   If yes:
   Judge: _____   Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No)   No
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No)   No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   ___ Yes   _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   ___ Yes   _X_ No

_____
A. BRENDAN STEWART
TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE
SD FL Court ID No. A5501801

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** ABIGAIL AGUILA

**Case No:** _____

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:**    Five (5) years' imprisonment

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** ESTRELLA PEREZ

**Case No:** _____

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

*** Max. Penalty:** Ten (10) years' imprisonment

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

*** Max. Penalty:** Five (5) years' imprisonment

Counts #: 3-4

Receipt of Kickbacks in Connection With a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

***Max. Penalty:** Five (5) years' imprisonment as to each count

Count #:

_____

_____

***Max. Penalty:** _____

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:** SOLCHYS PEREZ

**Case No:** _____

Count #: 1

Conspiracy to Commit Health Care Fraud

Title 18, United States Code, Section 1349

*** Max. Penalty:**   Ten (10) years' imprisonment

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

*** Max. Penalty:**   Five (5) years' imprisonment

Counts #: 5-6

Receipt of Kickbacks in Connection With a Federal Health Care Program

Title 42, United States Code, Section 1320a-7b(b)(1)(A)

***Max. Penalty:**   Five (5) years' imprisonment as to each count

Count #: _____

*Max. Penalty: _____

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** __MONICA MACIAS__

**Case No:** _____

Count #: 2

Conspiracy to Defraud the United States and Receive Health Care Kickbacks

Title 18, United States Code, Section 371

**\* Max. Penalty:** Five (5) years' imprisonment

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.